Tiffany R. Ellis (*Pro hac vice*)
**WEITZ & LUXENBERG, P.C.**
3100 W. Grand Blvd.
24th Floor
Detroit, MI 48202
(313) 315-3151
tellis@weitzlux.com

Melinda Davis Nokes, Bar No. 167787
**WEITZ & LUXENBERG, P.C.**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (949) 338-4303
Facsimile: (310) 786-9927

&

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
jennie@andrusanderson.com
lori@andrusanderson.com

*Attorneys for Plaintiff*
K.R. proceeding under pseudonym

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.R., an individual, | Case No.: 3:19-cv-08252 |
|         Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT FOR DAMAGES:** |
| G6 Hospitality, LLC; and Marriott International, Inc., |    1.  18 U.S.C. §1595<br>   2.  CAL. CIV. CODE §52.5 |
|         Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

COMES NOW Plaintiff K.R., by and through the undersigned counsel, and respectfully submits her second amended complaint for damages and makes the following averments.

**INTRODUCTION**

1.    For years, commercial sex trafficking ventures have brazenly operated in and out of Defendants' hotel properties throughout this country while Defendants continue earning substantial profits at the expense of human life, human rights, and human dignity.

2.    Defendants G6 Hospitality LLC (hereinafter "G6 Hospitality") and Marriott International, Inc. (hereinafter "Marriott")(collectively "Defendants"), knew and should have known for more than a decade that sex trafficking repeatedly occurred and continues to occur under their brand flags throughout the country.

3.    Rather than taking timely and effective measures to thwart this growing epidemic, G6 Hospitality and Marriott have instead chosen to ignore the open and obvious signs and presence of commercial sex trafficking in their brand hotels, benefitting from the profit created by rooms rented for this explicit and apparent purpose.

4.    This action for damages is brought by Plaintiff, a survivor of sex trafficking, hereinafter identified by her initials K.R., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5.    K.R. was first trafficked for commercial sex at the age of eighteen (18) years old in her native California.  Her first trafficker was a flirtatious older man, potential romantic partner who met her in a park in Oakland shortly after her high school graduation and promised her a house, successful career and a relationship. Further preying on the teenage girl's desire for adulthood and a relationship, K.R.'s first trafficker would routinely force methamphetamines on her by putting it in her alcohol.  This was to keep K.R. dependent on the drugs while her trafficker profited off of her sexual servitude.   This trafficker was violent, and K.R. escaped him only to be preyed upon by other traffickers within his

circle who bought, sold, and required her to sexually service paying strangers as she endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels for nearly a decade as the Defendants did nothing but profit.

6.     Plaintiff now brings this action for damages against Defendants.  Each Defendant, in violation of 18 U.S.C. § 1595, knowingly benefited from participation in a venture that it knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

7.     K.R. was advertised on Backpage.com against her will, physically tortured, and sexually exploited under such duress at hotels in Oakland and Millbrae, California including the Motel 6® Oakland Airport and the Westin® San Francisco Airport.

8.     As a direct and proximate result of Defendants G6 Hospitality and Marriott's consistent refusals to identify and prevent human trafficking in their brand hotel properties, K.R. was trafficked, sexually exploited, and repeatedly victimized at G6 Hospitality and Marriott branded hotels.

9.     The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. § 1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which K.R. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. § 1591 (a).

## **PARTIES**

10.    The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials K.R., was eighteen (18) years old when she was first sex trafficked throughout Northern California. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102 (15) and 18 U.S.C. § 1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14). The Plaintiff currently resides in San Joaquin County, California.

11.    Defendant Marriott is one of the largest hotel companies in the world offering public lodging

---

[1] Contemporaneously with her original Complaint, Plaintiff K.R. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion was granted.  Dkt. 8.  Plaintiff will also seek an additional protective order prohibiting disclosure of Plantiff's identity or whereabouts to her traffickers or any of their likely associates and other measures that will help ensure her safety throughout this litigation.

COMPLAINT FOR DAMAGES

services directly and through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters at 10400 Fernwood Road, Bethesda, Maryland, 20817.

    a. Defendant Marriott is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

    b. As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott.

    c. Westin hotels are an "upscale" hotel chain within the Marriott brand.

    d. Marriott owns, supervises, and/or operates the Westin San Francisco Airport located at 1 Old Bayshore Highway in Millbrae, California.

    e. Marriott is the principal in an agency relationship with the Westin San Francisco Airport.  In addition to being directly liable under Section § 1595, Marriott is vicariously liable for the acts and/or omission of staff at its Westin San Francisco Airport and all of its franchisee hotels.

    f. The Westin San Francisco Airport hotel where Plaintiff was trafficked has apparent agency for Marriott so as to establish vicarious liability under California law in addition to an actual agency relationship.

    g. Marriott has ratified the actions and inactions of the Westin San Francisco Airport.

    h. Marriott exercises day-to-day control over the Westin San Francisco Airport through its brand standards and retains control over the Westin under the terms of its franchise agreement.

    i. As the principal and as a hotel operator, Marriott controls the training and policies for its brand hotels including the Westin hotel where K.R. was trafficked. Marriott represents that it considers guest safety and security important and requires the brand hotels in its

portfolio to comply with Marriott brand standards and all local, state, and federal laws.[2]

j.  Through its relationship with the staff at the Westin where K.R. was trafficked and K.R.'s traffickers who were guests or visitors of the Westin San Francisco Airport, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through royalty payments, licensing fees, and percentage of the gross room revenue which it is entitled to under the franchise agreements.

k.  Marriott receives a percentage of the gross room revenue from the money generated by the operations of Westin hotels, including a percentage of the revenue generated for the rate charged on the hotel rooms in which the Plaintiff was sex trafficked.

l.  Marriott is subject to the jurisdiction of this Court because it regularly transacts business in the state of California; operates dozens of hotels in the state of California, including the Westin San Francisco Airport; caused indivisible injuries to the Plaintiff in the state of California; and profited from an illegal sex trafficking venture at the Westin San Francisco Airport.

12.  Defendant G6 Hospitality is one of the largest hotel brands in the world and offers public lodging services directly and through its affiliates, subsidiaries, and franchisees. G6 owns, manages, or operates more than 1,400 economy or budget motels under its Motel 6 brand. G6 Hospitality is a Delaware corporation with its headquarters at 4001 International Parkway, Carrollton, Texas.

a.  Motel 6 hotels are G6 Hospitality brand hotels.

b.  As a hotel operator, G6 Hospitality controls the training and policies for its brand hotels including the Motel 6 Oakland Airport where K.R. was trafficked under the terms of its franchise agreement.

c.  Defendant G6 Hospitality maintains that it considers guest safety and security to be

---

[2] *See* Marriott Human Rights Policy, *available at* www.marriott.com/Multimedia/PDF/Corporate/HumanRights.pdf, and Marriot Human Rights Policy Statement, July 2017, *available at* www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf.

important and requires the hotels in its portfolio to comply with G6 Hospitality brand standards and all local, state, and federal laws.[3]

d. Through its relationship with the staff at the Motel 6 hotels where K.R. was trafficked, and through the hotel guest perpetrators who trafficked K.R. at Motel 6® hotels, G6 Hospitality knowingly benefited, or received something of value, from its participation in, a venture which it knew or should have known to engage in sex trafficking through royalty payments, licensing fees, and a percentage of the gross room revenue which is included in the franchise agreements.

e. G6 Hospitality receives a percentage of the gross room revenue generated by the operations of Motel 6 hotels, including a percentage of the revenue generated from the rate charged for the rooms in which Plaintiff was trafficked for the purpose of commercial sex.

f. G6 Hospitality owns, supervises, and/or operates the Motel 6 Oakland Airport located at 8480 Edes Avenue in Oakland, California.

g. G6 Hospitality is subject to the jurisdiction of this Court because it regularly transacts business in the State of California; operates dozens of hotels in State of California, including the Motel 6® Oakland Airport; caused indivisible injuries to the Plaintiff in State of California; and profited from an illegal sex trafficking venture at the Motel 6® Oakland Airport.

13.    Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act(s), deed(s), or conduct by or through one or more of their officers, directors, agents, employees, and/or representatives who was/were actively engaged in the management, direction, control, and/or transaction of the ordinary business and affairs of the Defendants.

**JURISDICTION AND VENUE**

[3] G6 Hospitality International, Inc., Our Impact, https://g6hospitality.com/about-us/our-impact-2/ (last visited Dec. 5, 2019).

14.     This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

16.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

17.     To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and § 1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

18.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

19.     Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial

sex work.[4]

20.     The TVPRA is a remedial statute and should be liberally construed. It is a cardinal principle of statutory construction that a statute should, on the whole, be construed so that no clause, sentence, or word shall be considered superfluous, void, or insignificant.

21.     The requirements for direct (or indirect liability) under § 1595(a) based on a beneficiary theory has been stated as follows: (1) the entity must knowingly benefit, financially or by receiving anything of value; (2) from participation in a venture; and (3) that the entity knew or should have known engaged in sex trafficking.

22.     Under § 1595(a) Defendants need not have actual knowledge of sex trafficking occurring under its brand or a sex trafficking venture.  Knowingly receiving a financial benefit is sufficient for liability.

23.     The "should have known" plain text of § 1595(a) makes clear that the standard for liability under the TVPRA is a negligence standard of constructive knowledge. Being on notice about the prevalence of commercial sex trafficking generally at hotels under Defendants brands is sufficient constructive notice.

24.     Likewise "participation" under § 1595(a) does not require a common business purpose or actual knowledge of participation in a sex trafficking venture itself. Interpreting "participation" as requiring actual knowledge of a sex trafficking venture for liability under the TVPRA would render the "should have known" language in the statute completely meaningless.

25.     Plaintiff need not prove an underlying criminal offense in order to establish liability under the TVPRA.

26.     A facilitator of or participant in a venture under the TVPRA need not to have committed overt acts in furtherance of the venture.

27.     Under the TVPRA, in the absence of a direct association with a sex trafficking venture, it is

---

[4] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **both** categories are 'traffickers'.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

sufficient to show a continuous business relationship between a trafficker and local hotels through the rental of rooms so that it would appear that the trafficker and the hotels have established a pattern of conduct or could have been said to have or have had a tacit agreement.

## FACTUAL ALLEGATIONS

### A.  THE SEX TRAFFICKING OF K.R.

28.     The facts alleged herein stem from multiple sex trafficking rings operating in the California Bay Area.  While victimized by her traffickers in California, K.R. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from 2006-2016.

29.     In 2006, at eighteen (18) years old, K.R. was sitting in a park when she was approached by a man who sold her a teenage dream. He told K.R. that they were going to fall in love, buy a house, and make money together but he had far more nefarious intentions. The man drugged K.R. and brought her to an area in Oakland, California notorious for prostitution and sex trafficking – International Boulevard between 72nd and 74th streets.[5] K.R.'s parents reported her missing to the police observing her bike still locked up at the park.

30.     This section of International Boulevard in Oakland is otherwise known as "The Blade" because of its reputation.[6]

31.     K.R. was forced by her trafficker to walk the track between 72nd and 74th streets and sexually service the buyers that hailed her at the Westin San Francisco Airport located at 1 Old Bayshore Highway[7] and the Motel 6 Oakland Airport located at 8480 Edes Avenue.[8]

---

[5] *See* East Bay Times, "Spotlight: Oakland's child sex trafficking epidemic" (2017) https://www.eastbaytimes.com/2017/01/10/spotlight-oaklands-child-sex-trafficking-epidemic/,(last accessed July 2, 2020)("Night after night, a frantic mother drove along International Boulevard, a major hub for sex trafficking in California, in search of her 15-year-old daughter.").

[6] *See* The Bold Italic, "How Oakland became a National Hot Spot for Child Sex Trafficking: Modern Day slavery is here in plain sight."(2019) https://thebolditalic.com/how-oakland-became-a-national-hot-spot-for-child-sex-trafficking-b7496f67fe2e, (last accessed July 2, 2020)(" International Boulevard (a.k.a. "The Blade") in Oakland is notorious for minors being sex-trafficked, and it's most visible there. But traffickers do business in every nearby county around the Bay by luring in johns (sex buyers) through backdoor sites or popular review apps such as Rubmaps.")

[7] Airports "are a breeding ground for human trafficking because traffickers know that 'Johns' who travel . . . for brief meetings or conferences will engage in illicit sexual activities more willingly because of the anonymity they experience in a

32.    While K.R.'s trafficker did not set a formal quota for her to meet he made it abundantly clear to her she would be punished with if she did not bring him back a good profit.

33.    K.R.'s trafficker found he could control her by putting methamphetamines in her alcohol and punishing her with physical violence every time she tried to shirk his rules.

34.    Plaintiff's traffickers would regularly visit and use the Westin San Francisco Airport for purposes of commercial sex trafficking both of Plaintiff and of others and repeat the same process each time without intervention from hotel staff or Defendant Marriott.

35.    Plaintiff's traffickers would regularly visit and use the Motel 6 Oakland Airport for purposes of commercial sex trafficking both of Plaintiff and of others and repeat the same process each time without intervention from hotel staff or Defendant G6 Hospitality.

36.    The Motel 6 Oakland Airport had doors that led directly to the exterior from the guest rooms[9]:



new location. Law enforcement has investigated numerous cases of human trafficking that have taken place at hotels around [airport hotels]. *See* http://www.mdhumantrafficking.org/maryland (last accessed July 2, 2020).

[8] The Motel 6 Oakland is a less than two miles, or a four minute car ride, from The Blade. *See* https://goo.gl/maps/Jq2MjdtMrPsq9kY47 (last accessed July 2, 2020).

[9] Expedia.com, Motel 6, CA – Airport, https://bit.ly/3eW4JOq (last accessed July 2, 2020).

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8



9    37.    At the Westin San Francisco Airport K.R.'s trafficker would constantly walk unabashedly

10  through the hotels' front door and main lobby with his stable of other trafficked women, shepherding

11  them and their buyers to rooms.

12    38.    Every day K.R.'s traffickers would rent a room in cash for K.R. to use to service the buyers she

13  met on the track. Sometimes he would pay for weekends in lump sums. K.R.'s traffickers frequently

14  would make K.R. check into the room with her ID.  K.R. was forced by her traffickers to perform

15  commercial sex acts on an average of five (5) to ten (10) buyers per day.

16

17    39.    Each man entering and exiting the hotel and the room where K.R. was held at the Motel 6 or the

18  Westin as an unannounced guest.

19    40.    Each room was frequently left with numerous used condoms scattered across various surfaces at

20  the end of the evening. K.R. was trafficked with three (3) other girls who would share a room with her

21  and paraphernalia indicative of commercial sex was often left in the rooms when they left. There was

22  repeated direct contact between K.R.'s trafficker and hotel staff and K.R.'s trafficker would repeat this

23  process multiple times a week.

24    41.    While at the Westin and Motel 6 K.R. was watched and monitored by one of her traffickers to

25  ensure she did not leave. Someone was with K.R. at all times of the day.

26

27    42.    At the Motel 6 Oakland Airport, an employee came up the K.R.'s room and kicked them out on

28  the basis that their backpage.com advertisements were reported. However, K.R.'s trafficker was able to

1    bring her back to the same hotel shortly after.

2    43.    On one occasion, K.R.'s head was injured so badly that it was noticeable to the public.

3    44.    Prior to, during, and following the incidents described herein, the Defendants had actual and/or

4    constructive notice of drug consumption, prostitution, and/or general safety concerns at their hotels,

5    including, but not limited to, video surveillance of their hotels, as well as oral or written complaints

6    regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

7    45.    Had the Defendants been paying attention to the activities being conducted at their hotels and on

8    their hotels, and the apparent red flags outlined above, as well as following their own policies, it would

9    have been impossible for them not to notice the victimization of K.R.

10   **B.  DEFENDANTS' KNOWLEDGE OF THE SEX TRAFFICKING INDUSTRY**

11   46.    Human trafficking is the world's fastest growing crime.[10]  While the term "human trafficking"

12   incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each

13   year making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[11]

14   47.    Sex traffickers, or "pimps", use threats, violence, manipulation, lies, debt bondage, and other

15   forms of coercion to compel adults and children to engage in commercial sex acts against their will.

16   48.    The hospitality industry plays a crucial role in the sex trade.[12]   The trope of the "no-tell

17   motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy

18   and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal

19   venues for crime and sex trafficking in particular.

20   49.    Defendants are active and prominent members of the hotel industry and are, in fact, leaders

21   within it. Consequently, Defendants played and play a crucial role in the sex trafficking industry.[13]

22   50.    In 2010, the United States government released its Trafficking in Persons Report, which

---

[10] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[11] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] *Id.*

included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[14]

51.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[15]

52.     Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[16] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[17]

53.     A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[18] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[19]

54.     In December 2015, President Obama appointed eleven (11) survivors of human trafficking to

---

[14] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[15] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-globalinitiative.
[16] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[17] *Id.* at 15.
[18] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 4 (2015).
[19] *Id.* at 15.

the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[20]

55.     The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[21] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[22]

56.     Despite efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, including Defendants, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[23]

57.     Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[24] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[25]

58.     While specific to each Defendant, the problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[26] Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[27]

---

[20] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[21] *Id.* at 389.
[22] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[23] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[24] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[25] U.S. Dep't of State, *supra* n.31, at 387.
[26] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[27] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

59.     Traffickers use hotels as the hub of their operations.  Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

60.     Hotels are also the venue of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

61.     Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

62.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

63.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known, or should have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[28]

64.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel

[28] *Supra* at note 12.

industry over the last decade to help hotel staff in every position to identify the signs.[29]

65.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

66.     Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, including the franchise locations at issue in this case, may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[30]

67.     According to Defendant Marriott's *own policies* the following are "examples of the visible and hidden warning signs that Marriott shares with its hotel staff:

        a. Minimal luggage and clothing

        b. Multiple men seen being escorted one at a time to a guest room

        c. Individuals who can't speak freely or seem disoriented

        d. Guest who insist on little or no housekeeping."[31]

68.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[32] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these

---

[29] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[30] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf;)
[31] "Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking," (2019) https://news.marriott.com/news/2019/01/18/marriott-international-has-trained-500-000-hotel-workers-to-recognize-the-signs-of-human-trafficking (last accessed July 2, 2020).
[32] *Supra* at note 12.

COMPLAINT FOR DAMAGES

policies and procedures as brand standard through to the property level.

69.     Hospitality companies can and should mandate that *all* staff working at *all* hotels across their brand complete sex trafficking training.[33]

70.     Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[34]

71.     "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[35]

72.     Upon information and belief, reports by the Polaris Project were received and reviewed by the executives, directors, and managers of Defendants Marriott and G6 Hospitality between 2006 and 2016.

73.     Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendant Marriott between 2006 and 2016.

74.     Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendant G6 Hospitality between 2006 and 2016.

75.     Defendants have been cognizant of their role and responsibilities in the sex trafficking industry for years.

76.     Upon information and belief, between at least 2006 to 2016, Defendant Marriott participated in meetings through its trade organizations in which sex trafficking in its hotels was discussed.

77.     Among the numerous industry associations of which Marriott is a member, Marriott belongs to the International Tourism Partnership[36] which states "[h]uman rights is an issue that affects all industries but human trafficking and fair labour standards are of particular concern to the hotel sector."[37]

---

[33] *Supra* at note 30.
[34] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[35] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[36] https://www.tourismpartnership.org/about-us/ (last accessed July 1, 2020)
[37] https://www.tourismpartnership.org/human-rights/ (last accessed July 1, 2020)

78.     Defendant Marriott is, in fact, a leader in this organization, among others. For example, Marriott is featured on the International Tourism Partnership website for the following statement:[38]



> "Marriott International recognizes its unique opportunity in the travel and tourism industry to advance human rights. We have a created a robust human rights awareness program, which includes required trafficking awareness training, innovative solutions-based programming, and partnerships with expert nonprofits to educate, advocate for, and respect human rights. We are proud to partner with the International Tourism Partnership and work with our industry peers to take real action on human rights risks and drive meaningful positive change in the hotel industry"
> Tu Rinsche, Director, Social Impact & Global Responsibility, Marriott International

79.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[39]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and Defendants. Both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[40]

80.     Upon information and belief, Defendants Marriott and G6 Hospitality were aware of these campaigns.

81.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

---

[38] *Id.*
[39] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[40] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

### C. DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR PROPERTIES

#### a. For years, Marriott has been aware of sex trafficking at hotels under its brand.

82.   Upon information and belief, between at least 2006 and 2016, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

83.   Upon information and belief, at those meetings Marriott employees discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at Marriott properties, including the Westin San Francisco Airport Hotel.

84.   Marriott claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [41]

85.   In 2012, an anti-trafficking coalition alerted Defendants Marriott of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[42]

86.   Marriott claims it has supported the anti-trafficking group Polaris since 2010 and, in a partnership with ECPAT (End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes), developed a training module in 2010 or 2011 for hotel management and staff.[43]

87.   Yet, for years, including the years between 2006 and 2016 when Plaintiff was sold for commercial sex at Marriott properties, Defendant Marriott has failed to address the rampant culture of

---

[41] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[42] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).
[43] *Human Rights Policy*, MARRIOTT, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019); *See also* "ECPAT-USA and Marriott International Announce New Partnership to Protect Children from Trafficking," https://www.ecpatusa.org/blog/2018/1/29/ecpat-usa-and-marriott-international-announce-new-partnership (last accessed July 2, 2020).

sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Westin hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.R. that forms the basis of this complaint.

a. In December 1996, a member of the Philadelphia Eagles football organization allegedly raped a woman at a Westin near the San Francisco Airport. A conflicting claim stated that the woman was a prostitute and she filed the charges over a price dispute.[44]

b. In April 2006, a California defense contractor was alleged to have arranged for Congressman Randy "Duke" Cunningham to receive services from prostitutes at The Westin Grand in Washington, D.C.[45]

c. In February 2010, the police arrested a 27-year-old woman from California for prostitution at the Westin Copley Place in Boston.[46]

d. In December of 2018, a man was arrested after following a woman into the Westin Hotel elevator in downtown Seattle. He followed the victim into the elevator and got off the 14th floor, the victim sensed something was wrong and didn't go into her room immediately. He proceeded to follow and attacked her, struggling to take her pants off in the hallway, a hotel guest was able to free her from the suspect and call police.[47]

e. In July of 2015, a Texas couple were arrested for forcing a woman into prostitution at locations across the Midwest, including the Westin Hotel in downtown St. Louis. They were charged with one count of trafficking for the purpose of sexual exploitation and promoting prostitution.[48]

f. In April of 2009, a Boston University medical student, was arrested in Walpole and charged with the murder of Julissa Brisman as well as an April 10 armed robbery and

---

[44] FOOTBALL TEAM EMPLOYEE ACCUSED OF SEX ASSAULT, San Francisco Chronicle, 1997 WLNR 3715896 (January 1, 1997).
[45] Feds probe prostitution link in pol's bribery case, The Washington Post, 2006 WLNR 7469139 (April 29, 2006).
[46] Hub cops follow prostitution trail via Craigslist ad, Boston Herald, 2010 WLNR 2915914 (February 11, 2010); Notably, victims of commercial sex trafficking are often misidentified by law enforcement as prostitutes.
[47]https://www.kiro7.com/news/local/man-charged-with-assault-after-following-woman-into-westin-elevator/884123607
[48] https://www.stltoday.com/news/local/crime-and-courts/two-suspects-from-texas-arrested-for-human-trafficking-in-st/article_db93f47a-5a5a-5457-8f26-8d0ed7bcad03.html.

kidnapping at the Westin® Hotel in Boston. The first reported attack came on April 10 at the nearby Westin Copley Place hotel after a woman was bound and robbed. Both women had advertised massage services on Craigslist, an online classified service, and both were guests at luxury Marriott branded hotels.[49]

88. Upon information and belief, Defendant Marriott monitored criminal activity occurring at hotels under its brand across the country and would, at any time criminal activity occurred at a Marriott branded property, be aware of activity indicating commercial sex trafficking ore related crimes both under its brand and at particular locations, including the Westin San Francisco Airport hotel where K.R. was trafficked.

89.    Upon information and belief, Defendant Marriott regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com or Travelocity, including the Westin San Francisco Airport hotel where K.R. was trafficked.

90.    According to ECPAT-USA, in 2018 Defendant Marriott signed the organization's Child-Protection Code of Conduct ("The Code"), which the organization describes as "an industry-driven responsible tourism initiative with a mission to provide awareness, tools, and support to the travel and hospitality industry in order to prevent the sexual exploitation of children."[50]

91. Despite Marriott's 2006 public statements and 2010 agreement with ECPAT-USA to develop training programs for hotel staff, Marriott did not make its training program mandatory under January 2017.  Notably, as Marriott is aware, when implemented, the mandatory human trafficking awareness training program was mandatory for "on-property staff in both managed and franchised properties."[51]

### b. For years, G6 Hospitality has been aware of sex trafficking at hotels under its brand – including the Motel 6 Oakland Airport.

92.    Upon information and belief, between at least 2006 and 2016, Defendant G6 Hospitality held

---

[49] https://www.enterprisenews.com/x1484624275/Quincy-man-arrested-in-Craigslist-killing-case.

[50] "ECPAT-USA and Marriott International Announce New Partnership…"
[51] "Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking," (2019) https://news.marriott.com/news/2019/01/18/marriott-international-has-trained-500-000-hotel-workers-to-recognize-the-signs-of-human-trafficking (last accessed July 2, 2020).

meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

93.     Defendants knew or should have known that traffickers using the "call-in" method (where multiple men per day would visit the victim in her hotel room) were likely to seek out hotels where the rooms had external doors and would seek rooms overlooking the parking lot or not within view of the front desk.[52]

94. Upon information and belief, Defendant G6 Hospitality monitored criminal activity occurring at hotels under its brand across the country and would, at any time criminal activity occurred at a G6 branded property, be aware of activity indicating commercial sex trafficking both under its brand and at particular locations.

95. In 2015, the Berkeley Police Department conducted a sting operation at the very Motel 6 at issue in this case in order to find a missing fifteen (15) year old runaway who was being trafficked at that location.[53]

96. An investigation of the teenager's cellphone activity led Berkeley Police to the Motel 6 Oakland Airport where undercover officers set up a "date" in an attempt to find the girl.  Officers subsequently identified two motel rooms that were being used by traffickers and ultimately connect four people with the investigation and trafficking activities at the Motel 6 Oakland Airport.  When the rooms were searched arrests were made and narcotics were found.[54]

97. There are countless other examples across place and time of G6 Hospitality's knowledge of sex trafficking at its Motel 6 hotels and its continued, total inattention to preventing and remedying the blight of human trafficking. This illicit, criminal misconduct is so rampant throughout Motel 6 hotels

---

[52] *See, e.g.* Polaris Project, On-Ramps, Intersections and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking: Hotels and Motels (July 2018) at 20 (available on line at https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf) (last viewed July 2, 2020) ("request[ing] room overlooking parking lot or not within view of front desk" is "[t]trafficking indicator" in hotels and motels); The BEST (Business Ending Slavery and Trafficking) Trafficking Indicators for Lodging Establishments lists "A person reserving a room and requesting a suspicious location (next to an exit, on the hall alone, etc.)" as a potential indicator of sex trafficking in lodging establishments.
http://www.bestalliance.org/uploads/5/0/0/4/50047795/indicators_-_labor_and_sex.4.nn.pdf (last viewed June 2, 2020).
[53] https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.
[54] *Id.*

that one online reviewer suggested on a travel website that Motel 6 "Should Be Called Motel Sex."[55] For years, G6 Hospitality has failed to adequately address the rampant sex trafficking which tragically occurs throughout its Motel 6 hotels across the country, and as a result has facilitated the sex trafficking of Plaintiff K.R. at the Motel 6 Oakland Airport which forms the basis of this complaint.

a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6® in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[56]

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[57]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sex traffic fifteen (15) and sixteen (16) year old girls.[58]

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6® in Harvey, Illinois.[59]

e. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[60]

f. The Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments in August 2012, of several persons charged with human trafficking which occurred at the Motel 6® on Dublin-Granville Road in Columbus, Ohio as well as other locations.[61]

---

[55] Review of Motel 6 Rochester (Aug. 1, 2018), *available at* https://www.tripadvisor.com/ShowUserReviewsg43466-d242739-r601808847-Motel_6_Rochester-Rochester_Minnesota.html (last visited Feb. 28, 2019) (the reviewer was commenting in August 2018, on a Motel 6 located at 2107 West Frontage Road, Rochester, Minnesota 55901 and added, "Prostitutes, drug dealers, and loud partiers are your neighbors including possibly one or two staff members. Complaints to the clerk do no good. The night clerk does not write it down and the day clerks accuse you of lying although I made it clear that I did not want anything in return for my complaints.")
[56] https://www.vanityfair.com/news/2011/05/human-trafficking-201105.
[57] https://abc7chicago.com/archive/7771888/.
[58] https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html.
[59] https://www.justice.gov/usao-ndil/file/813771/download.
[60] https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.
[61] https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html.

g. The FBI investigated and arrested several individuals in December 2012, for human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[62]

h. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6® in Anaheim, California.[63]

i. In approximately March 2013, sex traffickers began selling sex out of Motel 6's in Bangor and Portland, Maine.[64]

j. Beginning in approximately May 2013, a fifteen (15) year old runaway was sex trafficked out of the Motel 6® on Caton Avenue in Baltimore, Maryland.[65]

k. The FBI busted a sex trafficking ring operating out of a Motel 6 in San Antonio, Texas in September 2013.[66]

l. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013, and charged with sex trafficking of two young women.[67]

m. Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[68]

n. In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[69]

o. In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.

---

[62] https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.
[63] https://abc13.com/archive/8909784/.
[64] https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.
[65] https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[66] https://www.ksat.com/news/sex-trafficking-ring-busted-at-motel-6.
[67] https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.
[68] https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.
[69] https://www.ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

p. A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[70]

q. In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[71]

r. In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security.  The girl was sold for sex, beaten, and starved by a sex trafficker.[72]

s. Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[73]

t. In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[74]

u. Over a fourteen (14) month period ending in approximately April 2015, a crime-ridden Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[75]

v. Seven people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[76]

w. In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[77]

---

[70] https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-city/21922915/.
[71] http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.
[72] https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153ee-fcb6-5333-9182-926a7f43dfbf.html.
[73] https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.
[74] https://www.newportri.com/article/20150324/NEWS/150329666.
[75] https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.
[76] https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.
[77] https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

1

2

x. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[78]

3

4

y. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[79]

5

6

7

8

z. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[80]

9

10

aa. In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[81]

11

12

13

bb. A federal court sentenced a man to ten (10) years in prison in November 2016, for sex trafficking a fifteen (15) year old girl in 2014 out of a Motel 6 in Hartford County, Connecticut.[82]

14

15

16

cc. In January 2016, a man who operated out of a Motel 6 in Frederick City, Maryland was charged with sex trafficking.[83]

17

18

dd. Criminal charges were brought against a man who sex trafficked a fifteen (15) year old girl out of a Motel 6 in Beaumont, Texas in March 2016.[84]

19

20

ee. On March 23, 2016, a victim of a sex trafficking ring died at a Motel 6 in Winchester, West Virginia.[85]

21

22

23

24

25

26

27

28

---

[78] https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.
[79] https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.
[80] https://www.sanluisobispo.com/news/local/article75832962.html.
[81] https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.
[82] https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114-story.html.
[83] https://baltimore.cbslocal.com/2016/01/16/frederick-police-arrest-man-on-human-trafficking-charges/.
[84] https://kfdm.com/news/local/women-accuse-defendant-of.
[85] https://www.localdvm.com/news/virginia/martinsburg-man-convicted-on-sex-trafficking-drug-charges/1708490814.

ff. The leader of a sophisticated and organized sex trafficking ring beat and raped one of his victims in April 2016, at a Motel 6 in Tinicum Township, Pennsylvania.[86]

gg. Local law enforcement rescued a seventeen (17) year old runaway in December 2016, who was being sex trafficked from a Motel 6 in Gibbstown, New Jersey.[87]

hh. In February 2017, the leader of a child sex trafficking ring in Tulsa, Oklahoma, was busted at a local Motel 6 where federal authorities rescued a sixteen (16) year old survivor of sex trafficking.

ii. A forty-five (45) year old man was charged with human trafficking after picking up a teenage boy from school and taking him to a Motel 6 in Cedar Park, Texas in approximately March 2017.[88]

jj. At a Motel 6® in Des Moines, Iowa a man sex trafficked a minor victim in June 2017.[89]

kk. In approximately June 2017, a seventeen (17) year old runaway was rescued by law enforcement from a Motel 6 in Las Vegas, Nevada out of which a sex trafficker was operating.[90]

ll. A seventeen (17) year old girl was sold for sex by traffickers at a Motel 6 in Portland, Oregon in June 2017.[91]

mm.     In August 2017, two (2) men operated out of a Motel 6 in Springfield, Virginia to sex traffic a sixteen (16) year old girl.[92]

nn. The City of Los Angeles settled a nuisance suit with G6 Hospitality, which operates Motel 6 hotels, in August 2017, for $250,000.00 in an effort to combat human trafficking at Motel 6® brand hotels.[93]

---

[86] https://patch.com/pennsylvania/phoenixville/man-behind-human-trafficking-ring-chester-county-sentenced.
[87] https://www.nj.com/gloucester-county/index.ssf/2017/09/post_139.html.
[88] https://www.khou.com/article/news/local/texas/little-elm-man-accused-of-trafficking-austin-teen/285-476893013
[89] https://www.desmoinesregister.com/story/news/crime-and-courts/2018/06/11/7-des-moines-residents-charged-sex-trafficking-feds-des-moines-sexual-prostitution-iowa-texas/692264002/.
[90] https://www.reviewjournal.com/crime/sex-crimes/woman-accused-of-sex-trafficking-runaway-on-las-vegas-strip/.
[91] http://mailtribune.com/news/crime-courts-emergencies/accused-human-traffickers-stopped-in-medford.
[92] https://patch.com/virginia/burke/16-year-old-forced-be-prostitute-springfield-motel-report.
[93] https://apnews.com/d13636fec55c42b88a08af18db6196fb.

oo. In October 2017, the County Attorney's Office for Harris County, Texas sued a local Motel 6 after law enforcement identified the property as a criminal hotspot that had been attracting drug activity, human trafficking, and violent crime for years.  The suit alleged the Motel 6 knowingly tolerated and failed to make reasonable efforts to abate the criminal activities on its property.[94]

pp. Two (2) men were arrested in December 2017, for sex trafficking a minor female out of a Motel 6 in Destin, Florida.

qq. In February 2018, a man engaged in sex trafficking of two (2) women at a Motel 6 near New Orleans, Louisiana.[95]

rr. The Columbus City Attorney's Office issued ultimatums in February 2018, to several area hotels to clean up or shut down, including but not limited to, the Motel 6 at 7480 North High Street near Worthington which, according to police had been the site of significant criminal activity.[96]

ss. Law enforcement responded to a 911 call from a seventeen (17) year old girl who was calling from the lobby of a Motel 6 in Claremont, California in February 2018.  Upon arrival, officers discovered that the seventeen (17) year old caller and a fifteen (15) year old girl were both being sex trafficked at the hotel.[97]

tt. In March 2018, police found a ten (10) year old girl wearing a dog collar with a twenty-three (23) year old man who had raped her at a Motel 6 in Lakeland, Florida.[98]

uu. In Richfield, Minnesota a man was criminally charged in June 2018, for sex trafficking a fifteen (15) year old girl out of an area Motel 6.[99]

---

[94] https://www.chron.com/neighborhood/spring/news/article/Harris-County-sues-Spring-area-motel-labeled-12293254.php.
[95] https://www.nola.com/crime/2018/10/man-accused-of-trafficking-took-females-to-new-orleans-to-make-some-money-for-mardi-gras-warrant.html.
[96] https://www.10tv.com/article/columbus-cracks-down-businesses-high-crime-rates.
[97] https://webbcanyonchronicle.com/2953/features/social-media-sexual-assault/.
[98] https://www.miamiherald.com/news/local/community/miami-dade/west-miami-dade/article207303799.html.
[99] https://kstp.com/news/man-charged-sex-trafficking-richfield-hotel/4955796/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vv. Police busted a human trafficking operation at a Motel 6 in Ann-Arbor, Michigan in July 2018.[100]

ww.     A Motel 6 in Braintree, Massachusetts surrendered its operating license in September 2018, after significant criminal activity, including sex trafficking, was documented occurring on its property.[101]

98. Not until September 2018 did G6 Hospitality LLC, the parent company of Motel 6, announce that "the company will introduce anti-human trafficking training to corporate, field and property team members...Additionally, the company developed its own training for all property team members to understand how to effectively intervene and identify potential trafficking situations to protect each other, guests and the community."

99. Even after Motel 6 made this this announcement, sex trafficking at Motel 6 hotels continued:

a. In November 2018, federal authorities arrested a man for sex trafficking a woman out of a Motel 6 in San Jose, California.[102]

b. In December 2018, a husband and wife were arrested for sex trafficking women who were Chinese nationals out of a Motel 6 in Portsmouth, New Hampshire from approximately 2016 through 2017.[103]

c. A fourteen (14) year old girl was held against her will at a Motel 6 in Raleigh, North Carolina and sex trafficked in or around January 2019.[104]

100. Upon information and belief, Defendant G6 regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com or Travelocity.

---

[100] https://www.mlive.com/news/ann-arbor/2018/12/man-charged-with-human-trafficking-at-ann-arbor-area-hotel.html.
[101] https://patch.com/massachusetts/braintree/motel-6-ends-fight-reopen-braintree-location.
[102] https://www.sanjoseinside.com/2018/11/09/alleged-pimp-arrested-in-san-jose-for-sex-trafficking-young-woman-he-found-on-instagram/.
[103] https://www.fosters.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme.
[104] https://www.wral.com/third-man-arrested-in-raleigh-alleged-child-trafficking/18104963/.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

101.  Through such review and monitoring Defendant G6 Hospitality has been aware of sex trafficking

occurring at Motel 6 hotels across its brand as well as the pervasiveness of customer reported sex

trafficking at G6 hotels and the local hotel's inattentiveness to such trafficking. For example:

    a.  Regarding a November 2012, stay at a Motel 6 in Madison, Alabama a customer wrote:
"Local police raided several rooms in the a.m. And arrested numerous 'guests' for what
we later found out were drug, prostitution, and sex trafficking charges!! Like a movie.
An extra $20 bucks gets you a better room, healthier conditions, and no 2:00 AM
SWAT team visit."[105]

[CONTINUED ON NEXT PAGE]

[105] https://www.tripadvisor.com/ShowUserReviews-g30677-d244048-r201566882-Motel_6_Huntsville_Madison-Madison_Alabama.html.

102.   To this day, this particular Motel 6 is still known to Defendant G6 and the outside world as a problem property where criminal activity including commercial sex trafficking occurs.  This March 7, 2020 Expedia review of the Motel 6 Oakland Airport is proof and was even acknowledged by a representative of Defendant G6[106]:

## 2/5

**Verified traveler, Clovis**
Business traveler, Traveled with partner
Mar 7, 2020

 Disliked: Amenities, property conditions & facilities

It was dirty, trashy. I noticed there were prostitutes, and drug dealers, and pimps . Had to call matience out because the toilet didn't work correctly. No shower curtain in shower. No free wifi. No warning about sprinklers coming on and sprayed all over my just washed bmw. Asked for extra pillows, took housekeeping 2 hours to bring some back. Overall, wont recommend this place to my friends. And my next trip will be staying someplace else.

Stayed 1 night in Mar 2020

👍 0

> **Response from Nancy on Apr 22, 2020**
> We're sorry to hear that you didn't enjoy your stay with us, and we apologize for any inconveniences you may have experienced. We hope for the opportunity to improve your experience with us. Please visit again. Nancy Y. #Team6

### c.  Each Defendant has been uniquely aware of trafficking at hotels across their brands because of their internet policies.

103.   Defendants each understand the importance that internet access can have to facilitate human trafficking.

104.   Defendants each signed on to ECPAT publicly committing to participate in the programs shown to assist in identifying and preventing human trafficking inside their branded hotels including following the ECPAT checklist.

105.   The ECPAT checklist specifically indicates that Wi-Fi passwords should be changed often and access to websites like Backpage and Craigslist Erotic services from their hotels should be monitored.

[106] Expedia.com, Motel 6 Oakland, CA – Airport, https://bit.ly/3eW4JOq (last accessed July 2, 2020).

106.  Defendant G6 Hospitality is the face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking in their hotel properties.

107.  Defendant Marriott is the face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking in their hotel properties.

108.  Defendant G6 Hospitality publicly committed to educating their hotel properties on human trafficking and should have created brand standards for implementation, mandates, and operations.

109.  Defendant Marriott publicly committed to educating their hotel properties on human trafficking and should have created brand standards for implementation, mandates, and operations.

110.  Defendants G6 Hospitality and Marriott recognize the value of offering free internet service to their customers.

111.  Defendant G6 Hospitality and Marriott require each hotel property to offer free internet service.

112.  Defendant G6 Hospitality and Marriott require hotel properties to use brand approved internet providers, who are sufficient to provide cybersecurity and prevent illegal activity from occurring at their hotels.

113.  Defendants G6 Hospitality and Marriott's hotels are provided access to internet access data which they knows will help enhance customer service or otherwise permits the brand to exploit by other means.

114.  Internet access at their brand hotel properties is through two means:

    a. First, Defendants provide internet access to guests through wireless internet accessible in their guest rooms;

    b. Second, Defendants provide internet access through publically accessible wireless networks accessible in the lobby and other common areas of their brand hotels.

115.  Defendants collect data on internet usage through the wireless internet services that Defendants provide, such data includes:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      a.  The IP address, and other identifying information, for all devices that access the internet through Defendants' wireless networks;

      b.  The identity of websites accessed by those devices, through the IP addresses of the servers that host those websites; and

      c.  Information about the user accessing the internet including through Defendants' wireless networks, including the users' room number, a user-provided name, and other identifying information.

116.   Motel 6's High Speed Internet Terms and Conditions provides that Motel 6 has "the right . . . to monitor, intercept, and disclose any transmissions over or using the facilities related to the Service, and to provide subscriber billing, account, or use records, and related information under certain circumstances."[107]

117.   Marriott's Property Internet Terms of Use provides that Marriot does "record the room number of the user for billing purposes. The record of a specific name associated with that room number is stored in a separate database to protect the privacy of the user. A log of all usage activity relating to this Service is maintained."[108]

118.   Defendants' internet access policies each purportedly prohibit the use of the internet access that they provide for unlawful purposes.

119.   Motel 6's policy provides, "You agree that we may access your computer to investigate activity that may be in violation of these Terms and Conditions; or to comply with law. You agree not to use or attempt to use the Service, the Motel 6, or Studio 6 network or website, or your computer for any fraudulent, unlawful, harassing or abusive purpose."[109]

---

[107] Motel 6 - High Speed Internet Terms and Conditions, ¶ 9, available at https://www.motel6.com/hsi_tc/, last accessed July 2, 2020.
[108] Marriot – Property Internet Terms of Use, available https://www.marriott.com/marriott/internet-access/termsofuse.mi, last accessed July 2, 2020.
[109] See *supra* note 1.

120.   Marriott's policy provides, "You agree not to use this Service to: (a) transmit any material that is unlawful, threatening, abusive . . . (b) harm, or attempt to harm, minors in any way."[110]

121.   Marriott's policy further provides,[111]

## No Editorial Control

The Companies do not review nor exercise any editorial control over the content or materials made available over the Internet by third parties, including without limitation any electronic mail transmissions, newsgroups, or the like. However, We may remove, block, filter, or restrict by any other means any materials that, in the Companies' sole discretion, may be illegal, may subject the Companies to liability, or may violate these Terms of Use. The Companies may cooperate with legal authorities and/or third parties in the investigation of any suspected or alleged crime or civil wrong. Any violation of these Terms of Use may result in the suspension or termination of your access to this Service.

122.   In violation of their federal statutory obligations under the TVPRA, Defendants failed to monitor internet use at hotels across their brands, including the local hotels at issue in this case, in order to identify signs and perpetrators of commercial sex trafficking operating within their walls.

123.   Defendants knew or should have known of the prevalent use of websites like Backpage.com, Craigslist.com, and other similar websites by traffickers to post advertisements for sex from within their properties.

124.   Despite that knowledge Defendants made no effort to flag or block the use of such websites by traffickers, instead Defendants exercised willful blindness to the use of their wireless networks to further human trafficking in their hotels, including the hotels where Plaintiff was trafficked.

125.   Defendants' blindness facilitated trafficking at their hotels by allowing traffickers to post unlawful advertisements through Defendants' own wireless networks in violation of Defendants' own policies on the use of those networks.

### D.   DEFENDANTS ARE DIRECTLY LIABLE UNDER SECTION 1595 FOR THEIR INACTION AND FAILURES RESULTING IN COMMERCIAL SEX TRAFFICKING OCCURING AT THEIR BRAND PROPERTIES

126. Marriott and G6 Hospitality have been on notice of repeated incidences of sex trafficking occurring at their Motel 6 and Westin brand hotels since as early as 2006 yet these brand managers

---

[110] See *supra* note 2.
[111] *Id.*

failed, and persist in failing, to fulfill their statutory responsibility resulting in commercial sex trafficking occurring on their brand properties.

### a.  Marriott is directly liable under the TVPRA.

127.   Marriott owns, supervises, and/or operates the Westin® San Francisco Airport located at 1 Old Bayshore Highway in Millbrae, California.

128.   Marriott failed to train, implement and enforce any of its own anti-trafficking policy or policies to protect Plaintiff from being sex trafficked.

129.   Marriott failed to monitor and audit the Westin San Francisco Airport hotel and all of its franchise locations for incidences of commercial sex trafficking.

130.   Marriott knew or should have known that the Westin hotel where Plaintiff K.R. was trafficked was an area known for high incidence of crime and prone to commercial sex trafficking activity.[112]

131.   Marriott could and should have exercised control over its brand hotels, including the Westin San Francisco Airport by:

    a. distributing information to assist employees in identifying human trafficking for commercial sex;

    b. providing a process for escalating human trafficking for commercial sex concerns within the Marriott organization;

    c. requiring regular reports of suspicious or criminal activity that indicates commercial sex trafficking to a centralized database for audit and analysis;

    d. requiring employees to attend training related to human trafficking for commercial sex;

    e. providing new hire orientation on human rights and corporate responsibility;

    f. providing training and education to Westin® hotels through webinars, seminars, conferences, and online portals;

    g. developing and holding ongoing training sessions on human trafficking; or

    h. providing anti-trafficking checklists, escalation protocols and information to property

---

[112] *Supra* at note 7.

management staff; or tracking performance indicators and key metrics on human trafficking prevention.

132.  Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its brand hotels, including the Westin San Francisco Airport, Marriott has repeatedly failed to stop or adequately address sex trafficking at it hotels, including the Westin San Francisco Airport.

### b.   G6 Hospitality is directly liable under the TVPRA

133.  Defendant G6 Hospitality owns, supervises, or operates the Motel 6® Oakland Airport located at 8480 Edes Avenue, Oakland, California 94621.

134.  G6 Hospitality failed to train, implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked.

135.  G6 Hospitality knew or should have known that the Motel 6® hotel where Plaintiff K.R. was trafficked was an area known for high incidence of crime and prone to commercial sex trafficking activity on and around the hotel premises, including when Plaintiff was sex trafficked.

136.  G6 Hospitality failed to monitor and audit the Motel 6 for incidences of commercial sex trafficking.

137.  Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its hotels, Defendant G6 Hospitality has repeatedly failed adequately address commercial sex trafficking at its brand hotels.

138. Defendant G6 Hospitality could and should have exercised control over its brand properties, including the Motel 6 by:

a. distributing information to assist employees in identifying human trafficking for commercial sex;

b.  providing a process for escalating human trafficking for commercial sex concerns within the G6 Hospitality organization;

c. requiring employees to attend training related to human trafficking for commercial sex;

d. providing new hire orientation on human rights and corporate responsibility;

e. providing anti-trafficking training and education to Motel 6 hotels through webinars, seminars, conferences, and/or online portals;

f. developing and holding ongoing training sessions on human trafficking for commercial sex; or

g. providing checklists, escalation protocols and information to property management staff;

h. or tracking performance indicators and key metrics on human trafficking prevention.

139. More than half the bookings at Motel 6® hotels occur on the same day as arrival. Accordingly, Motel 6® executives have worked to make booking hotel rooms at their properties even easier. As one executive of Motel 6 stated: "Analytics is our North Star. It is how we make decisions, it's how we drive our strategy and it is how we dictate performance."

140. As alleged herein, the Motel 6 brand has been more than willing to use data analytics to increase its profits; yet, it has historically refused to use the same data analytics, or take any reasonable measures, to prevent human trafficking at Motel 6 hotels.[113]

### E. DEFENDANTS ARE VICARIOUSLY LIABLE FOR THE CONDUCT OF THE LOCAL OPERATING HOTELS WHO ARE BOTH THEIR FRANCHISE PARTNERS AND AGENTS DUE TO THEIR LEVEL OF CONTROL

141. *In addition to and apart* from Defendant's direct liability, Plaintiff alleges Defendants are vicariously liable for the conduct of the local hotels.

142. Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

---

[113] Allison Schiff, *Motel 6: 'Analytics Is Our North Star'*, AdExchanger (Sept. 7, 2017), https://adexchanger.com/analytics/motel-6-analytics-north-star/amp/.

143.    The average consumer, including Plaintiff and her traffickers, does not see this relationship. The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

144.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[114]  The corporate brand parents, and Defendants, can see booking and reservation trends, including for those hotels where Plaintiff was trafficked.[115]

145.    The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

146.    Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

### a. Marriott is indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent West San Francisco Airport.

147.   Defendant Marriott owns, supervises, and/or operates the Westin® San Francisco Airport located at 1 Old Bayshore Highway in Millbrae, California.

148.   Defendant Marriott has and exercised control over the local hotel with respect to many issues regarding the day to day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking.

---

[114] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.
[115] Where a brand hotel allows cash to be accepted for payment monitoring and auditing these trends can become important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

149.  Defendant Marriott is aware that human trafficking occurs at its local hotels and of how their local hotels have dealt with it.  Since 2006, defendant Marriott has issued and published policies to address the problem.  By doing so, it has exercised control over its local hotels specifically with respect to how to identify and handle human trafficking at the local hotels. "At Marriott, our commitment to human rights is governed by Marriott's Human Rights Council.  Marriott implements a human rights due diligence and risk management process to identify, prevent and mitigate relevant risks." (See https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRightsStatement.pdf) Such due diligence cannot be accomplished without Marriott having uniform control over its local hotel properties with regards to their policies and procedures regarding traffickers and victims.

150.  Marriott failed develop effective policies and/or failed to implement and enforce its own policy or policies and protect Plaintiff from being sex trafficked.

151.  Marriott knew or should have known that the Westin San Francisco Airport hotel where Plaintiff was trafficked was an area known for high incidence of crime and prone to sex trafficking activity.[116]

152.  Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, including the Westin San Francisco Airport Hotel, Defendant Marriott has repeatedly failed to prevent or adequately address commercial sex trafficking at it hotels, and particularly the trafficking of Plaintiff.

153.  Marriott exercises actual control over its franchisees, including the Westin San Francisco Airport, through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel.[117]

154.  Marriott exerts dominion and control over its franchisees, and has control over the day-to-day operations in a number of areas:

---

[116] *Supra* at Introduction.
[117] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm (last visited July 2, 2020).

a. Sales Managers and Reservation Managers are required to devote their full time to the management and operation of the Hotel, and cannot be employed in any other capacity by the Franchisee or its Affiliates without Marriot's express written consent;

b. Franchisees are required to keep restaurants and lounges open and in normal operation for such minimum hours and days stipulated by Marriott;

c. Franchisees are required to  maintain in sufficient supply, and use at all times, certain food and beverage products and ingredients, supplies, paper goods, dinnerware and furnishings;

d. Franchisees are prohibited from installing vending machines or video games on the premises.[118]

155.   Marriott also has control over the existence of the franchisor-franchisee relationship and has the ability to terminate the franchise:

a. "Franchisor may, at its option, terminate this Agreement and all rights granted hereunder without affording Franchisee any opportunity to cure the default" for material defaults of the franchise agreement."[119]

156.   Defendant Marriott may exercise or could have exercised control over Westin hotels by:

a. distributing information to assist employees in identifying human trafficking;

b. providing a process for escalating human trafficking concerns within the organization;

c. requiring employees to attend training related to human trafficking;

d. providing new hire orientation on human rights and corporate responsibility;

e. providing training and education to Westin® hotels through webinars, seminars, conferences, and online portals;

f. developing and holding ongoing training sessions on human trafficking; or

---

[118] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm at pp. 7, 8, 9, (last visited July 2, 2020).

[119] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm at p. 28 (last visited July 2, 2020)

g. providing checklists, escalation protocols and information to property management staff;
or tracking performance indicators and key metrics on human trafficking prevention.

157.   The Westin San Francisco Airport Hotel where K.R. was trafficked was and is the actual and apparent agent of Marriott and together they offer, or offered, public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over Westin® hotels by Defendant Marriott's operations, including the means and methods of how Westin® hotels conducted daily business through one or more of the following actions:

a. hosting online bookings on Defendant Marriott's domain;

b. requiring Westin® hotels to use Defendant Marriott's customer rewards program;

c. setting employee wages;

d. making employment decisions;

e. advertising for employment;

f. sharing profits;

g. standardized training methods for employees;

h. building and maintaining the facility in a manner specified by the owner;

i. standardized or strict rules of operation;

j. regular inspection of the facility and operation by owner;

k. fixing prices; or

l. developing uniform and consistent policies regarding the prevention of commercial sex trafficking at brand properties, including a risk management process to identify, prevent, and mitigate risks for commercial sex trafficking[120]; and

m. other actions that deprive Westin hotels of independence in business operations.

158.   An apparent agency also existed/exists between Defendant Marriott and the Westin San Francisco Airport hotel. Defendant Marriott holds Westin hotels to the public as possessing authority to act on its behalf.

---

[120] *Supra* at ¶81.

159.    As alleged herein, the employees of the Westin San Francisco Airport observed and were aware of Plaintiffs plight, yet the policies and procedures from Defendant Marriott to address this victimization were either inadequate to prevent her trafficking or were not properly implemented due to lack of training, education and or enforcement by the Marriott.

160.    As alleged herein and upon information and belief, the employees of the Westin San Francisco Airport were aware of Plaintiff's trafficking and pursuant to corporate-wide policies reported such activity directly to defendant Marriott, including illegal website use, booking and reservation history, payment by cash for several rooms at a time and visits from multiple men throughout the day.

161.    Marriott was aware not only aware of Plaintiff's plight but also the failures of its own policies and procedures to protect her and prevent trafficking at the Westin San Francisco Airport hotel.

162.    Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Westin hotels, and the particular hotel at issue in this case, Defendant Marriott breached its duties in the following ways:

    a. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    b. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    c. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    d. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    e. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

g. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

163.    Marriott brands may kick delinquent hotels out of its system, including the Westin San Francisco Airport, however, since it is at the expense of terminating their royalty payments, it is seldom done. Nevertheless this consequence is what provides Marriott the actual control over the Westin San Francisco Airport including control over how it confronts and deals with known traffickers and trafficking victims such as Plaintiff.

164.    Marriott accepted the profits from K.R.'s trafficker even though the signs of her trafficking were open and obvious and receipt of those profits was, based on information and belief, in direct violation of their own policies and procedures regarding the frequent repeat business they had with K.R.'s trafficker.

165.    Marriott knew or should have known that such profits were derived from the trafficker's illegal and tortious activities.

166.    If defendant Marriott had ensured that the local hotel was following their policies on identifying victims of trafficking and undertaking actions to prevent the rental of rooms to known traffickers rooms would not have been made available to KR's trafficker and no profits would have been gained.

167.    Acceptance of these profits was Marriott's affirmation of the Westin San Francisco Airport hotel's total inaction with regard to K.R.'s trafficker and her victimization.

**b. G6 Hospitality is indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent Motel 6.**

168.    G6 Hospitality owns, supervises, or operates the Motel 6 Oakland Airport located at 8480 Edes Avenue, Oakland, California 94621.   G6 Hospitality failed to implement and enforce any of its own policy or policies and protect Plaintiff K.R. from being sex trafficked.

169.    Defendant G6 Hospitality has and exercised control over the local hotel with respect to many

issues regarding the day to day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking.

170.   Defendant G6 Hospitality is aware that human trafficking occurs at its local hotels and of how their local hotels have dealt with it.   Defendant G6 Hospitality has issued and published policies to address the problem.   By doing so, it has exercised control over its local hotels specifically with respect to how to identify and handle human trafficking at the local hotels. "Motel 6 and Studio 6 hotels implement a variety of practices that help to prevent human trafficking through enhanced safety and security procedures; employee and franchise education, training and response; and partnerships and advocacy. (See https://g6hospitality.com/about-us/combating-human-trafficking/).   Such due diligence cannot be accomplished without G6 Hospitality having uniform control over its local hotel properties with regards to their policies and procedures regarding traffickers and victims.

171.   G6 Hospitality failed to develop effective policies and/or failed to implement and enforce its own policy or policies and protect Plaintiff K.R. from being sex trafficked.

172.   Plaintiff and her traffickers understood when she stayed at Defendants' branded locations, including this Motel 6, that individuals working at the location were agents, representatives, and or employees of Defendants and were authorized to transact business on behalf of Defendants. Plaintiff understood that the money paid to book her room went to Defendants and Defendants' branded property. And Defendant Associations understood that their dues and fees were paid with those profits.

173.   All of the documents signed, electronically and in paper form, to book a room, and advertisements of the Defendants' property established that those individuals working at the property were working on behalf of Defendants (that own the brand property).

174.   G6 Hospitality knew or should have known that the Motel 6 hotel where Plaintiff K.R. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff K.R. was trafficked.

175.   Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant G6 Hospitality has repeatedly failed to stop or adequately

address sex trafficking at its hotels.

176.  Defendant G6 Hospitality may exercise or could have exercised control over Motel 6 hotels by:

    a.  distributing information to assist employees in identifying human trafficking;

    b.  providing a process for escalating human trafficking concerns within the organization;

    c.  requiring employees to attend training related to human trafficking;

    d.  providing new hire orientation on human rights and corporate responsibility;

    e.  providing training and education to Motel 6® hotels through webinars, seminars, conferences, and/or online portals;

    f.  developing and holding ongoing training sessions on human trafficking; or

    g.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

177.  G6 Hospitality exercises actual control over its franchisees through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel.[121]

178.  G6 Hospitality exerts dominion and control over its franchisees, and has control over the day-to-day operations in a number of areas:

    a.  Franchisee may only offer such goods and services as are specifically approved by G6 Hospitality in writing;

    b.  Franchisees are required to operate the Motel 6 twenty-four hours a day, every day, unless otherwise approved in writing by G6 Hospitality;

    c.  Franchisees are prohibited from increasing or decreasing the number of rooms at each Motel 6 without express written authority by G6 Hospitality;

    d.  G6 retains the authority to designate a single supplier of certain goods which the Franchisee must purchase.

---

[121] *See G6 Hospitality Franchising, LLC v. HI Hotel Group LLC*, No. 1:11-cv-02176, ECF No. 224, Attachment #2 (M.D. Pa. May 19, 2015).

e. If the Franchisee wishes to purchase items from an unapproved seller, written authority must be received by G6 Hospitality.

f. G6 Hospitality retains the right to set maximum or other pricing requirements with respect to the prices that the Franchisee may charge for goods and services. [122]

179. G6 Hospitality also has control over the existence of the franchisor-franchisee relationship and has the ability to terminate the franchise:

a. "Franchisor may, at its option, terminate this Franchise Agreement and all rights granted hereunder without affording Franchisee any opportunity to cure the default" for material defaults of the franchise agreement." [123]

180. G6 Hospitality was in an actual or apparent agency relationship with Motel 6® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant G6 Hospitality's exercise of an ongoing and systemic right of control over Motel 6® hotels by Defendant G6 Hospitality's operations, including the means and methods of how Motel 6® hotels conducted daily business through one or more of the following actions:

a. hosting online bookings on Defendant G6 Hospitality's domain;

b. requiring Motel 6® hotels to use Defendant G6 Hospitality's customer rewards program;

c. setting employee wages;

d. making employment decisions;

e. advertising for employment;

f. sharing profits;

g. standardized training methods for employees;

h. building and maintaining the facility in a manner specified by the owner;

i. standardized or strict rules of operation;

---

[122] *G6 Hospitality Franchising, LLC v. HI Hotel Group LLC*, No. 1:11-cv-02176, ECF No. 224, Attachment #2 at pp. 5, 6, 7 (M.D. Pa. May 19, 2015).
[123] *G6 Hospitality Franchising, LLC v. HI Hotel Group LLC*, No. 1:11-cv-02176, ECF No. 224, Attachment #2 at p. 20 (M.D. Pa. May 19, 2015).

COMPLAINT FOR DAMAGES

j.  regular inspection of the facility and operation by owner;

k.  fixing prices; or

l.  other actions that deprive Motel 6® hotels of independence in business operations.

181.  An apparent agency also exists between Defendant G6 Hospitality and Motel 6® hotels. Defendant G6 Hospitality held out Motel 6® hotels to the public as possessing authority to act on its behalf.

182.  Given Defendant G6 Hospitality's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Motel 6® hotels, Defendant G6 Hospitality breached its duties in the following ways:

a.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

b.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

c.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

d.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

e.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

f.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

g.  Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

183.  G6 Hospitality may kick delinquent hotels out of its system, including the Motel 6 Oakland Airport but is at the expense of terminating their royalty payments so it is seldom done.

184.     G6 Hospitality accepted the profits from K.R.'s trafficker even though the signs of her trafficking were open and obvious and receipt of those profits was, based on information and belief, in direct violation of their own policies and procedures regarding the frequent repeat business they had with K.R.'s trafficker.

185.     G6 Hospitality knew or should have known that such profits were derived from the trafficker's illegal and tortious activities.

186.     If defendant G6 Hospitality had ensured that the local hotel was following their policies on identifying victims of trafficking and undertaking actions to prevent the rental of rooms to known traffickers rooms would not have been made available to KR's trafficker and no profits would have been gained.

187.     Acceptance of these profits was G6 Hospitality's affirmation of the Motel 6® Oakland Airport hotel's total inaction with regard to K.R.'s trafficker and her victimization.

## F.  DEFENDANTS' LIABLITY UNDER THE TVPRA

### a.  Defendants knowingly benefited financially from the sex trafficking at their local hotels

188.     Aside from their unique position in this growing epidemic, Defendants have the highest obligation and statutory duty to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[124]

189.     G6 Hospitality and Marriott profited from the sex trafficking of K.R. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture.

190.     G6 Hospitality and Marriott rented rooms to K.R.'s traffickers knowing, or should have known, that they were using the room to harbor K.R., physically assault her, and subject her to repeated

---

[124] *Supra* at note 12.

exploitation as she was forced into sexual servitude.

191.    G6 Hospitality and Marriott knew, or should have known, that K.R. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because K.R.'s traffickers frequented the Defendants' hotels and paid for the room rental.

192.    G6 Hospitality and Marriott International profited from the sex trafficking of K.R. and knowingly or negligently aided and participated with K.R.'s traffickers in their criminal venture. The Defendants took no action as K.R. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person while in the constant presence of her trafficker.

193.    Defendants deliberately disregarded the implementation of best known anti-trafficking policies, practices, and procedures to maintain profit.

194.    Defendants knew that their expenses would increase if they hired more security personnel and funded more training programs. Additionally, Defendants would lose revenue by preventing human traffickers from renting rooms. The combination of increased expenses and lost revenue meant less profit. In fact, profits were the driving force of their hollow "No Room for Trafficking" campaigns, as they improved Defendants image without any real impact on operations.

195.    The Defendants all financially benefited from the sex trafficking of K.R., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers.)

196.    G6 Hospitality and Marriott enjoy the steady stream of income that sex traffickers bring to their budget level hotels, such as Motel 6 and Westin.

197.    G6 Hospitality and Marriott financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

198.    The Defendants maintained their deficiencies to maximize profits by:

        a.  Reducing the cost of training employees and managers of how to spot the signs of

human trafficking and sexual exploitation and what steps to take;

b.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

c.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

### b.  Defendants participated in a sex trafficking venture at and through their local hotels

199.   There was a continuous business relationship through the rental of rooms between Plaintiff's traffickers, Defendants G6 Hospitality and Marriott, and the local hotels.

200.   Defendants G6 Hospitality and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to K.R.'s traffickers in which to harbor K.R. while they trafficking her.

201.   Defendants G6 Hospitality and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from K.R. in which to harbor K.R. while she was being trafficked.

202.   The Defendants all had the opportunity to stop K.R.'s traffickers and offenders like them from victimizing K.R. and others like her.  Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

203.   The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their hotels.

204.   Even though Defendants were aware of the best policies, practices, and procedures necessary to fight human trafficking and despite Defendants' part in formulating, assessing, and promoting the best policies, practices and procedures together, Defendants failed to implement them by, among other acts,

omissions and commissions described in this complaint:

    a. Reducing the costs of training employees and managers how to spot signs of human trafficking.

    b. Failing to refuse room rentals or report guests to law enforcement; and

    c. Lowering a number of security costs and measures that could have combatted sexual trafficking and exploitation.

205.  To date, Hotel Defendants have failed to train all of their employees to look for signs of trafficking.

206.  The failure to implement best policies, practices, and procedures was not an oversight by Defendants Marriott and G6 Hospitality.

    **c.  Defendants knew or should have known sex trafficking venture we operating out of their hotels**

207.  Due to Defendants' failures to enact anti-trafficking policies and procedures to comply with the TVPRA, Defendants, in essence, turned a blind eye to human trafficking. Therefore, the Defendants' failure to investigate and monitor human trafficking is sufficient to establish Defendants knew or should have known of human trafficking for commercial sex occurring at their brand properties, including the locations where Plaintiff was trafficked.

208.  G6 Hospitality and Marriott knew, or should have known, that K.R. was being trafficked because K.R. constantly entertained foot traffic at the rented room to appease her traffickers' daily quotas, her traffickers would help check her in then not proceed to the room, and she often displayed visible injury while seemingly never allowed to be alone. These behaviors indicated that Plaintiff's traffickers were using the Defendants' hotels for a sex trafficking venture.

209.  As a direct and proximate result of these egregious practices on the part of the Defendants, K.R. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**

## A. COUNT ONE – 18 U.S.C § 1595 ("TVPRA")

210.    The Plaintiff K.R. incorporates each foregoing allegation.

211.    K.R. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

212.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. § 1591 (a).   At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of K.R. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

213.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.   Moreover, the Defendants directly benefitted from the trafficking of K.R. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of K.R.'s injuries and damages.

214.    K.R. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. § 1591 (a).

## B. COUNT TWO - CAL. CIV. CODE §52.5

215.    The Plaintiff K.R. incorporates each foregoing allegation.

216.    K.R. is a victim of sex trafficking within the meaning of California Penal Code §236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code §52.5.

217.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code §52.5. At all relevant times, the Defendants breached

their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

218.     The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of K.R.'s injuries and damages.

219.     K.R. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of Cal. Civ. Code §52.5.

220.     K.R. is also entitled to punitive damages under Cal. Civ. Code §52.5.

### PRAYER FOR RELIEF

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising  umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future lost wages and loss of earning capacity;

d.  past and future emotional distress;

e.  consequential and/or special damages;

f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.  punitive damages with respect to each cause of action;

h.  reasonable and recoverable attorneys' fees;

i.  costs of this action; and

j.  pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

### DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated:  July 2, 2020

**RESPECTFULLY SUBMITTED,**
**PLAINTIFF, by Her Attorneys,**

/s/ *Tiffany R. Ellis*
Tiffany R. Ellis (*Pro Hac Vice*)
**WEITZ & LUXENBERG, P.C.**
3100 W. Grand Blvd.
24th Floor
Detroit, MI 48202
(313) 315-3151
tellis@weitzlux.com

Melinda Davis Nokes (SBN 167787)

**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (949) 338-4303
Facsimile: (310) 786-9927
mnokes@weitzlux.com

*and*

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
Audrey Siegel (SBN 286771)
**ANDRUS ANDERSON LLP**
*Attorneys for Plaintiff*
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
jennie@andrusanderson.com
lori@andrusanderson.com
audrey.siegel@andrusanderson.com

COMPLAINT FOR DAMAGES

# EXHIBIT A

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes **posters** of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign

23
24
25
26
27
28

COMPLAINT FOR DAMAGES



# What is Human Trafficking?

**Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.**

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

### Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

### What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.

COMPLAINT FOR DAMAGES



# SIGNS OF HUMAN TRAFFICKING
## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





## SIGNS OF HUMAN TRAFFICKING

For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

### GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

COMPLAINT FOR DAMAGES





### SIGNS OF HUMAN TRAFFICKING

For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

#### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

#### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

COMPLAINT FOR DAMAGES





## SIGNS OF HUMAN TRAFFICKING

### For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

**GENERAL INDICATORS**

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

COMPLAINT FOR DAMAGES